UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT GARCEAU, ET AL.,

               Plaintiffs,                                Case No. 12-cv-15513

v.

                                               Paul D. Borman

CITY OF FLINT, ET AL.,                   United States District Judge

               Defendants.
_____/

OPINION AND ORDER
(1) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT REGARDING
REVERSE RACE DISCRIMINATION (ECF NO. 53) AND (2) DENYING IN PART AND
GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
REGARDING RETALIATION (ECF NO. 54)

       This is a federal civil rights action involving claims of reverse race discrimination and

First Amendment retaliation.  The action was filed in December 2012 by fourteen Caucasian

City of Flint Police Officers Robert Garceau, Alan Dickenson II, Steven Howe, Cary Wooster,

Kevin Smith, Eric Eads, Lawrence Laframboise, Troy Simpson, Esther Campbell, Chad

Baldwin, Rodney Hall, John Cramer, William Surface, and Michael Ross against the City of

Flint, the former Chief of Police for the City of Flint, Alvern Lock, and a former Captain of the

City of Flint Police, Darryl Patterson.

       Now before the Court are Defendants City of Flint, Darryl Patterson, and Alvern Lock's

Motions for Summary Judgment.  The Court previously granted Defendants' request to bifurcate

the claims in this action into two separate motions for summary judgment because of the large

number of Plaintiffs and the complexity of the issues.  Accordingly, Defendants filed a Motion

for Summary Judgment regarding Alleged Reverse Race Discrimination (ECF No. 53) and a

Motion for Summary Judgment regarding Alleged Retaliation (ECF No. 54).  Plaintiffs timely

filed responses to each Summary Judgment motion (ECF Nos. 58, 59) and Defendants filed replies (ECF Nos. 61, 62).

A hearing on these motions was held on Friday, June 3, 2016. For the following reasons, the Court will (1) grant Defendants' motion for summary judgment regarding reverse race discrimination and (2) grant in part and deny in part Defendants' motion for summary judgment regarding retaliation such that only Plaintiff Surface's First Amendment retaliation claim against Defendants Lock and City of Flint survives.

## I. BACKGROUND

A.      Historical Background of Flint Police Department

Approximately twenty years ago, white officers in the Flint Police Department challenged the City of Flint's race-based quota plan which required that 50% of all police officers who were promoted to the rank of sergeant be members of specified minority groups. In 1996, the United States Court of Appeals for Sixth Circuit reversed the district court (Newblatt, J.) and held that the City of Flint's race-based quota plan was unconstitutional because it had failed to evidence that the plan served "a 'compelling state interest' and because, in any event, it was not 'narrowly tailored' to achieve the claimed interest." *Middleton v. City of Flint*, 92 F.3d 396, 413 (6th Cir. 1996).

Approximately ten years later, more than forty white police officers filed civil rights complaints against the City of Flint and then Mayor of Flint, Donald Williamson, alleging that Mayor Williamson unlawfully discriminated against them when he personally selected and appointed officers based on their race to a newly formed "Citizens' Service Bureau." *See e.g. Porter, et al. v. City of Flint*, No. 07-14507, 2009 WL 1406405, at *1 (E.D. Mich. May 19, 2009)

2

(Cohn., J.).  Ultimately, pursuant to an agreement, these civil rights cases were consolidated and proceed to arbitration in 2012.  The arbitrator found in favor of the plaintiffs and held that "race was a substantial causative factor in the selections to the Citizens Service Bureau" and awarded damages.  (ECF No. 58, Pls.' Resp., Ex. 3, CBS Arbitration Award, at 12.)

It is undisputed that Defendant Lock was not the Chief of Flint Police at the time of either of these earlier actions, and was, in fact, was retired during the Citizens' Service Bureau litigation.  Defendant Patterson testified that he was the last sergeant to be promoted under the quota plan that was overturned by the Sixth Circuit's decision in *Middleton*.

B.      Provisional Appointments in 2011

The process to permanently appoint an officer to the rank of sergeant is undisputed.  The City must appoint the officer off of an "eligibility list."  The eligibility list was created based upon the results of a written and oral exam.  (ECF No. 53, Ex. C, Young Dep., at 9-10, 51.)  The written portion of the exam was formulated by an expert panel, which included the union presidents, human resource representatives, and a company, Standard and Associates.  (Young Dep., at 50-51.)  Any officer with at least four years of experience in the City of Flint Department as a police officer, or any officer with three years of experience and one year of college or 30 semester hours was allowed to sign up for and sit for the sergeant exam.  (*Id*. at 51.)  If the officer received a 70% or higher on the written portion of the exam, the officer would then take an oral exam.  Each portion of the exam accounted for 50% of the final test score.  (*Id*. at 44-45.)  Only officers that passed the promotional test could be permanently promoted to the rank of sergeant.  (*Id*. at 52.)

3

In 2011, the Governor of Michigan appointed an Emergency Manager to run the City of Flint due to its financial woes. Around the time of that appointment, a large number of sergeants in the Flint Police Department, as well as other City employees, decided to retire, ostensibly because of the looming threat of a reduction in benefits due to the City's unstable financial condition. (Young Dep. at 25; Ex. B, 2015 Arbitration Award at 2.) In 2011, and at the time that many sergeants retired, the City did not have an "eligibility list" of officers for the classification of sergeant.

Defendant Lock, then Chief of the Flint Police, relying upon Rule VII, Section 3 of the Personnel Rules and Regulations, decided to "provisionally" appoint sergeants to the openings created by the retirements while a promotional exam was created. (ECF No. 53, Ex. E, Lock Dep. (July 2015), at 7-9; Young Dep. at 13, 29-30.) Rule VII, Section 3 provided that when a vacancy developed that could not be filled "due to absence of an appropriate eligible list, the position may be filled by provisional appointment pending the establishment of an appropriate eligible list." (Young Dep., at 9-10, Young Dep., Ex. 1, at 3, PG ID 1185.) Rule VII, Section 3 further provided that the provisional appointment "shall, insofaras [sic] practicable, be limited to a maximum of ninety (90) days." (*Id.*)

Defendant Lock asked Defendant Patterson and T.P. Johnson, both provisionally appointed captains, to present him with a list of those individuals they believed to be the "best suited" and "qualified" for the position. (ECF No. 53, Ex. F, Johnson Dep., at 6-7.) Johnson, testified that he concentrated on people he "thought would be very good" at the position and

officers familiar with investigations.[1]  (*Id.*, at 10-12.)  Defendant Patterson testified that some of his criteria were "work ethic, responsibility, ability to do the job, ability to be in a position and have enough authority to make a decision."  (ECF No. 53, Ex. G, Patterson Dep., at 21.) Defendant Lock was the final decisionmaker regarding the provisional appointments.  (Lock Dep., at 19; Johnson Dep., at 17.)

On or about December 25, 2011 Defendant Lock provisionally appointed eight police officers to the rank of sergeant.  Then, on January 22, 2012, Defendant Lock provisionally appointed four more.  (Young Dep., at 13.)  The names and races of those officers were:

| | | |
|---|---|---|
| 1. Bender, David (Caucasian ("C")) | 5. Dumanois, Michael (C) | 9. Rodgers, Eric (AA) |
| 2. Bradford, Alvin (African American ("AA")) | 6. Gauthier, Andrew (C) | 10. Donastorg, Alfino (AA) |
| 3. Burnett, E. Renea (AA) | 7. Lott, Vennette (AA) | 11. Mata, Daniel (Hispanic) |
| 4. Dixon, Ronald (AA) | 8. Petrich, Karl (AA) | 12. Wheeler, Steven (AA) |

(ECF No. 53, Ex. H, Young 12/10/14 Email with appointment dates; Ex. M, Police Ethnicity Breakdown 2/7/2013.)  Thereafter, these individuals were demoted and then re-promoted to these positions every 90 days.  Defendant Lock explained that he believed this was necessary to prevent the provisional appointments from becoming permanent.  (Lock Dep., at 13.)

C.     Promotional Exam in June 2012

On June 7, 2012, the written portion of the sergeant's promotional exam was held, and

---

[1] The Court notes that Captain Johnson, a white male, was not named as a defendant in this action.  It is undisputed that Captain Johnson participated in the same manner as Defendant Patterson in the process to recommend officers to Defendant Lock for provisional appointment to sergeant.  (Lock Dep. at 7, 12; Johnson Dep. at 6-7.)

thereafter an oral exam was held on June 25, 2012. (Young Dep., at 19.) Sixty-five police officers sat for the written exam, but only nine officers passed (six of them being provisionally appointed at that time). Additionally, twenty-one officers signed up for the exam but did not take the exam, and one officer withdrew. (*Id*.) Plaintiffs Baldwin, Eads, Campbell, Ross, Surface, and Smith failed the exam while Plaintiffs Dickenson, Garceau, Hall, Howe, Laframboise, and Wooster signed up for the exam but did not take the exam. Plaintiff Cramer and Simpson did not sign up for the exam. (*See* ECF No. 53, Ex. I, 2012 Promotional Eligibility List.)

> D.     Permanent and Provisional Appointments in August 2012

On August 15, 2012, Defendant Lock issued a Memo regarding permanent and provisional sergeant appointments effective August 19, 2012. (Ex. J, Lock Memo 8/15/12.) The nine officers who had passed the promotional exam were permanently promoted to the rank of sergeant:

| | | |
|---|---|---|
| 1. Rodgers, Eric (AA) | 4. Gauthier, Andrew (C) | 7. Boudreau, Mark (C) (non-pro) |
| 2. Petrich, Karl (AA) | 5. Pillsbury, Todd (C) (non-pro) | 8. Dumanois, Michael (C) |
| 3. Bender, David (C) | 6. Dixon, Ronald (AA) | 9. Handley, Myra (AA) (non-pro) |

(*Id*., "non-pro" designating the officers who were appointed permanent sergeants and who were not previously provisionally appointed to the position.) These nine permanent promotions still left eight vacant sergeant positions. Defendant Lock testified that he decided to maintain the provisional sergeants who had failed the exam in their positions because they had already been trained in the position. (Lock Dep., at 18-19.) To this end, the August Memo also announced the provisional appointment of eight officers to the rank of sergeant: six of those officers, Patrick

(formerly Burnett), Bradford, Mata, Donastorg, Lott and Wheeler were already provisionally appointed and had failed the 2012 exam.  (Ex. J, Lock Memo 8/15/12; Ex. I, 2012 Promotional Eligibility List.)  The other two officers provisionally appointed in August 2012 were: Tyrone Booth an African-American who failed the 2012 test, and Dominic Tefft, a Caucasian, who did not sign up for the exam.  (*Id.*; Young 12/10/14 Email.)  Additionally, on June 23, 2013, Defendant Lock provisionally appointed David Hanson, a Caucasian who did not sign up for the 2012 test.[2]  (Young 12/10/14 Email.)

   E.  Promotional Exam in 2013

   The second sergeants' exam was held October 22, 2013.  (Young Dep., at 23.)  Oral exams were held in late March and early April, 2014.  (*Id.*)  Twenty-seven officers passed and were placed on the eligibility list, while twenty-six officers failed the exam, one did not appear, and one withdrew.  (*Id.*; ECF No. 53, Ex. K, 2013 Eligibility List.)  The top nine officers on the eligibility list were permanently promoted to sergeant, including three plaintiffs and four previously provisionally appointed sergeants:

| | |
|---|---|
| 1. Surface, William (Pl., C) | 6. Hanson, Daniel (pro., C) |
| 2. Groulx, Jason (non-pro, C) | 7. Donastorg, Alfino (pro., AA) |
| 3. Campbell, Esther (Pl., C) | 8. Simpson, Troy (Pl., C) |
| 4. Tefft, Dominic (pro., C) | 9. Santiago, Douglas (non-pro, H) |

---

[2] Defendants repeatedly state that all provisional sergeants that failed the 2012 test remained in their positions.  While this is technically a true statement, Defendants do not differentiate between the six provisional sergeants that continued as provisionals after August 2012, and the three other provisional sergeants that were appointed later, in August 2012 (Officers Booth and Tefft) and June 2013 (Officer Hansen).  Additionally, while Defendants represent that Tefft sat the exam in 2012 and failed, his name does not appear on the 2012 test results.  (Ex. I, 2012 Promotional Eligibility List.)

7

| 5. Mata, Daniel (pro., H) | |
|---|---|

(Young 12/10/14 Email; 2013 Eligibility List; "pro." referring to previous provisional appointment; "non-pro" referring to an individual not previously provisionally appointed; "Pl." referring to Plaintiffs in the present action.)  Three Plaintiffs, Surface, Campbell, and Simpson, passed the exam and were permanently promoted to the rank of sergeant, while Plaintiffs Michael Ross and Rodney Hall passed the exam but were ranked too low (20th and 27th respectively) on the eligibility list to receive a promotion.[3]  (*Id*.)  Similarly, two provisionally appointed sergeants, E. Renae Patrick (formally Burnett), and Steven Wheeler, both passed the 2013 exam but were ranked too low for promotion.  The other remaining provisionally appointed sergeants, Tyrone Booth, Vennette Lott, and Alvin Bradford, failed the 2013 test and were not promoted.  Two provisionally appointed officers, Alvin Bradford and E. Renea Patrick, failed the exam twice and retired at the rank of sergeant prior to being demoted. (Surface Dep. (July 2015), at 85.)

      F.      Arbitration of Class Action Grievance

On August 29, 2012, the Flint Police Officer's Association filed a "class action grievance" on behalf of the entire union, alleging that the City violated Article 35 of the parties' Collective Bargaining Agreement ("CBA") when it provisionally appointed officers to the rank of sergeant without regard for seniority.  (ECF No. 53, Ex. L, Grievance.)  Article 35 of the CBA provided that "Temporary assignments for the purpose of filling vacancies of Employees who are absent will be granted to the senior qualified Employee for such job.  Such Employees will

---

[3] Plaintiff Cramer testified that he did not take the 2013 exam because he felt that he would not have been promoted regardless of his score.  (ECF No. 58, Ex. 17, Cramer Dep., at 21.)

receive the rate of pay of the higher classification of all hours worked while filling such

vacancy." (ECF No. 53, Ex. B, Arbitration Award, 3/27/15, at 3.) The City countered that it

was not bound by the terms of the CBA on "provisional appointments" because Article 35 spoke

only to "temporary appointments." The City further contended that "provisional appointments"

were governed by Rule VII, Section 3 of the Personnel Rules and Regulations entitled,

"Provisional Appointment," which provided that when a vacancy occurred as a result of the lack

of an elibility list, "the position may be filled by provisional appointment pending the

establishment of an appropriate eligible list." (*Id.* at 6.)

An arbitration hearing on this issue was held on December 10, 2014. (*Id.*) On March

27, 2015 the arbitrator denied the class action grievance and found that Article 35 did not govern

the provisional promotions and further held that the fact the union had failed to object to the first

twelve provisional appointments could be "construed as a waiver of any future objections to such

appointments pursuant to Rule VII Section 3." (*Id.* at 9.)

G.      "Garceau and the Gang" and Defendant Lock's Comments

Plaintiff Garceau testified that Defendant Patterson referred to Plaintiff Wooster and

himself as "Garceau and the Gang" as they entered the report writing room shortly after the

instant lawsuit was filed. (ECF No. 58, Ex 8, Garceau Dep., at 69.) Plaintiff Garceau also heard

the previous city attorney, Tom Kent, refer to him and Plaintiffs Laframboise and Smith as

"Garceau and the gang" as they walked into a negotiation room and described the term as

"demeaning" but not racial. (*Id.* at 109-11.) Similarly, Plaintiff Eads testified that Rodney

Williams, an officer with Internal Affairs, identified him as part of "Garceau and the Gang" on

an unknown date at the union office. (ECF No. 58, Ex. 9, Eads Dep. at 41-42.) Plaintiff Howe

9

testified that it was "common knowledge" that Defendant Lock referred them as "Garceau and the Gang" but admitted he never heard Defendant Lock (or anyone else specifically) utter the phrase.  (ECF No. 58, Ex. 10, Howe Dep., at 39.)  Plaintiff Simpson had never heard the phrase "Garceau and the Gang."  (ECF No. 58, Ex. 13, Simpson Dep., at 46.)  Finally, Plaintiff Dickenson testified he had heard of the term "Garceau and the Gang" but did not know what the term "gang" referenced.  (ECF No. 58, Ex. 14, Dickenson Dep., at 93.)  Rodney Williams testified that he likely said "Garceau and them" at one point but did not use the term "gang." (ECF No. 58, Ex. 20, Williams Dep. (July 2015), at 15-16.)

Prior to the filing of this lawsuit, at a command meeting on November 21, 2012, Defendant Lock allegedly stated "If I weren't chief of police, I would kick Rob Garceau's ass." (Garceau Dep., at 5-6; Third Am. Compl., at ¶ 53.)  Defendant Lock confirmed that he made the comment, but explained he made the threat after Plaintiff Garceau had made a threat against him. (Lock Dep. (July 2015), at 24-25.)  Defendant Lock testified that he merely informed the staff at the command meeting of the threat and restated that he "if he threatened me again, I was going to kick his ass."  (*Id*., at 25-27.)  Defendant Lock never filed a complaint against Plaintiff Garceau for his earlier alleged threat.  (*Id*., at 27-28.)

In approximately March of 2011, Plaintiff Baldwin was transferred from his position as an officer in the courts to patrol by Defendant Lock.  (ECF No. 58, Ex. 6, Baldwin Dep., 14-16.) Defendant Lock told Plaintiff Baldwin that the transfer was because, "Well, we need a black female."  (*Id*. at 14.)  Defendant Lock then appointed an African-American officer Michelle Tucker to Plaintiff Baldwin's former position in the courts.  (*Id*. at 14-16.)

10

Around the time of the 2012 promotional exam, Plaintiff Howe testified that now retired Lieutenant James Peterson advised him that Defendant Lock mentioned him by name during a staff meeting and indicated that Plaintiff Howe "wasn't going to get anything [he] wanted as long as [Lock] is here."  (Howe Dep. at 24-27, 29.)  Defendant Patterson also informed Plaintiff Howe that he would not be getting a position he requested at the impound lot, stating "I don't know what you did to piss [Lock] off, but he said, 'Hell, no.  He ain't getting anything as long as I'm here.'" (*Id*. at 26.)  Around this same time, then provisionally appointed Sergeant Lott told Plaintiff Howe that Defendant Lock had informed her that regardless of her test score he would keep her on as a sergeant.  (*Id*. at 40; *see also* ECF No. 58, Ex. 23, Lott Dep., at 37, stating that she could not recall if Defendants Lock or Patterson told her she would keep her sergeant's position even if she failed the 2012 exam.)  Plaintiff Howe testified that these comments informed his decision not to even show up for the 2012 promotional exam because he believed that regardless of his score he would not be promoted.  (Howe Dep., at 24.)

H.     The "NBC"

Rodney Williams testified that he was ordered by a previous Flint Police Chief to investigate claims of a "N..... Beating Crew" also referred to as "NBC" that operated within the Flint Police Department.[4]  (Williams Dep. (July, 2015), at 26-27; ECF No. 58, Ex. 16, Campbell Dep., at 34-35.)  Plaintiffs Campbell, Hall, and Simpson testified that they had been erroneously identified as part of the NBC which allegedly operated on the third shift and was known for assaulting minorities in the course of arrests or bookings.  (Campbell Dep., at 34-35; ECF No. 58, Ex. 7, Hall Dep., at 45-46; ECF No. 58, Ex. 13, Simpson Dep., at 48; ECF No. 58, Ex. 24,

---

[4] It is unclear from his testimony when this investigation occurred.

11

Meeks Dep., at 19-20.)  Plaintiff Campbell further testified that she was subjected to harassment by other officers, specifically Petrich, for being an alleged participant in the NBC.  (Campbell Dep., at 34-35.) Officer Tanya Meeks testified that Plaintiffs Garceau, Wooster, Smith, Eads, Laframboise, Simpson, Campbell, Dickenson, and Howe were all rumored to be part of the NBC.  (ECF No. 58, Ex. 24, Meeks Dep., at 19-20, 33.)

The investigation conducted by Williams found there was insufficient evidence to sustain the allegations that the NBC existed.  (Williams Dep. (July, 2015), at 27.)  The United States Department of Justice ("DOJ") also conducted an investigation into the allegations in 2005, but did not find any truth to the allegations.  (Hall Dep., at 45-46.)  Plaintiff Hall testified that Defendants Lock and Patterson were in "upper command" at the time of the DOJ investigation. (*Id.*)

I.      "LEIN Sting"

It is undisputed that there was a long-standing rule against parking in the rear of the Flint Police Station, although there was differing testimony regarding whether the rule was collectively ignored.  (ECF No. 61, Ex. R, 2001 Barksdale Inter-Office Memo.)  On September 15, 2012, Defendant Patterson used the LEIN network to run the license plates of the vehicles parked in violation of the rule in the rear parking lot of the station.  (ECF No. 61, Ex. R, Captain's Report at 2.)  Defendant Patterson determined that Plaintiffs Garceau, Howe, and Wooster, as well as Sergeant Brian Burdy improperly parked their vehicles and wrote them up for violation of a departmental rule.  (*Id.*; *see also* Lock Dep., Ex. 3, PGID 1479-80.)  Plaintiff Garceau's violation was ultimately dismissed because he was authorized to park in the lot at that time.  (Lock Dep., Ex. 3, PGID 1479.)

Plaintiff Howe testified that after he was written up for improperly parking, Officer Meeks, an African-American, advised him that she was warned by Defendant Patterson not to park in that lot over the weekend because he was going to write up people. (Howe Dep., at 31.) Plaintiff Howe did not know if other African-American officers were warned. (*Id*.) Officer Meeks testified that Sergeant Sergio Thomas, an African-American, told her not to park there at some point in time, but denied that Defendant Patterson had warned her that he was going to write anyone up ahead of time. (Meeks Dep., at 7-8.)

J.     Disciplines of Plaintiffs that Post-Date this Lawsuit

On November 27, 2012, Captain Johnson took a citizen's complaint that Plaintiff Garceau had acted "angry and rude" to her and boyfriend when he responded to a call. (ECF No. 54, Ex. D, Garceau Discipline History, Incident Report at PGID 1757.) Plaintiff Garceau was on a call regarding a burglary and the citizens asked him to fill out a form for the Secretary of State regarding a vehicle car in their backyard. (Johnson Dep., at 19.) They claimed that Plaintiff Garceau looked through the windshield but then informed them that he "didn't have time" for the issue. (*Id*.) Captain Johnson testified that he was "embarrassed" by Plaintiff Garceau's behavior so he filed the complaint. (Johnson Dep., at 19-20.) Plaintiff Garceau denied this verison of the events and claimed that he unsuccessfully attempted to find the VIN Number, apologized to the citizens when he could not locate it, and advised them to call 911 later if they found paperwork or VIN number and he would return. (Garceau Discipline History, Incident Report at PGID 1759.)

The complaint was investigated by Sergeant Bender who authored an Investigative Report and recommended sustaining the violations of unsatisfactory performance, attention to

duty, and requests for service.  (*Id*.)  Defendant Lock issued Plaintiff Garceau a three day suspension for the violations effective on January 11, 2013.  (*Id*. at PGID 1752.)  Thereafter, Plaintiff Garceau grieved the suspension and it was reduced from three days to one day. (Garceau Dep. at 38.)

Plaintiff Dickenson received an eight day suspension effective January 15, 2013.  (ECF No. 54, Ex. F, Dickenson Discipline Records, at PGID 1820.)  On or about October 10, 2012, Plaintiff Dickenson allegedly responded to a call but failed to get out of his car for almost an hour.  Plaintiff Dickenson denied this version of events and claimed he responded to the call and knocked on the door, but surmised the woman did not hear him or had left the residence.  He further claimed that he waited at the address because he had been told by the dispatcher that the woman would return shortly.  (*Id*., Investigative Report Synopsis, at PGID 1822-23.)  Sergeant Bigelow, who conducted the investigation, found that the citizen may have been wrong to conclude Plaintiff Dickenson did not get out of his cruiser.  Sergeant Bigelow, however, found the amount of time Plaintiff Dickenson spent on the call (almost an hour) was an excessive amount of time given that no contact was made with the complainant.  Accordingly, Sergeant Bigelow recommended that the charge of unsatisfactory performance be sustained.  (*Id*.) Lieutenant Tindell concurred in the finding, and Defendant Lock gave Plaintiff Dickenson an eight-day suspension.  (*Id*.)

On October 8, 2013, Plaintiff Surface received a twenty-nine-day suspension for using excessive force.  Plaintiff Surface had participated in the arrest of a man suspected of a violent assault during the Back to Bricks festival in Flint on August 13, 2013.  The arrest was observed by Defendant Lock, the Chief of Police of University of Michigan, Flint, Raymond Hall, and a

14

state trooper, Matthew Bolger.  During the course of the arrest, Hall and Bolger observed

Plaintiff Surface hit or slap the suspect's head.  (*See* Ex. 58, Ex. 25, Raymond Hall Dep., at 10-

14; Ex. 26, Bolger Dep., at 14.)  None of the witnesses, however, saw the suspect resist Plaintiff

Surface's arrest, and accordingly Hall, Bolger and Defendant Lock believed Plaintiff Surface's

actions amounted to an unreasonable use of force. (*See* Raymond Hall Dep., 35; Ex. 26, Bolger

Dep., at 18; and Lock Dep. (July 2015), at 32.)  The suspect did not file a complaint against

Plaintiff Surface.  (Surface Dep. (October 2015), at 14.)

Plaintiff Surface testified that he had tapped the back of the suspect's head as a

diversionary technique because the suspect was being verbally noncompliant and had paused and

tensed up while Plaintiff Surface attempted to turn him around to administer handcuffs.  (Surface

Dep. (July 2015), at 45-48.)  Plaintiff Surface testified that he believed that an attack was

imminent and the force he used was reasonable.  (Surface Dep. (October 2015), at 8.)  Defendant

Lock did not approach Plaintiff Surface after the incident and he finished his shift.  (*Id*. at 53.)

Plaintiff Surface was eventually put on administrative leave without explanation, and then put on

light duty for a month.  (Surface Dep. (July 2015), at 47-48.)  He was then brought back to

regular duty shortly before being suspended for 29 days for the incident.  (*Id*.)  Plaintiff Surface

had two previous written reprimands and three oral reprimands over the past 16 years, and none

involved excessive force.  (ECF No. 54, Ex. C, Surface Discipline History.)  The 29-day

suspension was overturned in arbitration.  (Surface Dep. (October 2015), at 59; ECF No. 59, Ex.

25, 2015 Surface Arbitration.)

## II. PROCEDURAL HISTORY

This action was filed on December 17, 2012 against Defendants City of Flint, Alvern

Lock and Darryl Patterson.  (ECF No. 1.)  Plaintiffs filed their First Amended Complaint on December 28, 2012 and a Second Amended Complaint on January 29, 2013.  Count I of the Second Amended Complaint is one of reverse race discrimination pursuant to 42 U.S.C. §§ 1983, 1981.  In Counts II, and III of Plaintiffs' Second Amended Complaint, Plaintiffs Howe, Dickenson, Garceau, and Wooster allege that Defendants retaliated against them for opposing the discrimination in violation of the First and Fourteenth Amendments.

On November 7, 2013, this Court granted in part and denied in part Defendants' Motion to Dismiss the Second Amended Complaint.  *Garceau, et al. v. City of Flint* (*Garceau I*), No. 12-15513, 2013 WL 5954493 (E.D. Mich. Nov. 7, 2013).  This Court dismissed Plaintiffs' Count II, "Harassment and/or Retaliation based upon race in violation of Equal Protection Rights asserted by Plaintiffs Dickenson II, Howe, Garceau and Wooster," in its entirety; the Court concluded that Plaintiffs had explicitly withdrawn their Fourteenth Amendment retaliation claim under § 1983, and found that there was no private cause of action for retaliation under § 1981.  *Id.*, at *4-5.

This Court also found that in regards to Count III, "First Amendment Violations Against Plaintiffs Dickenson II, Howe, Garceau, and Wooster," Plaintiffs had asserted three separate instances of protected conduct: (1) the filing of the class action union grievance; (2) complaints that Defendants misused the LEIN system, and (3) the filing of the instant lawsuit.  *Id.*, at *5. This Court then concluded that the class action grievance did not constitute a "public concern," and that the allegations regarding the misuse of the LEIN system did not constitute a plausible claim of First Amendment retaliation.  *Id.*, at *7-8.  This Court held, however, that Plaintiffs adequately pleaded a First Amendment retaliation claim based upon the filing of the instant

16

lawsuit.  *Id*., at *8.  This Court found that Plaintiffs had sufficiently pleaded adverse actions in regards to Plaintiffs Garceau and Dickenson, both of whom alleged they were subjected to excessive suspensions in retaliation after this lawsuit was filed.  *Id*., at *9 (citing Second Am. Compl. at ¶¶ 77, 78).  Finally, this Court denied Defendants' request to dismiss the Plaintiffs' claims of discrimination against Defendant City of Flint and concluded that Plaintiffs had set forth adequate allegations to plausibly support their claims.  *Id*., at *10.

On appeal, the United States Court of Appeals for the Sixth Circuit held that Defendants Lock and Patterson were not entitled to qualified immunity protection for the First Amendment claims because the filing of a lawsuit claiming racial discrimination was a "well-established" matter of public concern and was thus protected by the First Amendment.  *Garceau, et al. v. City of Flint* (*Garceau II*), 572 F. App'x 369, 371 (6th Cir. 2014).  The Sixth Circuit further held that this Court did not err in declining to grant the Defendant City's motion to dismiss the discrimination and retaliation claim against it because "the complaint contains sufficient factual material to raise a 'plausible' inference that the defendants maintained a policy or custom that led to discrimination and retaliation."  *Id*. (citation omitted).

On August 21, 2015, after obtaining leave from the Court, Plaintiffs filed their Third Amended Complaint.  (ECF Nos. 46, 47.)  The Third Amended Complaint set forth the identical claims previously asserted in the Second Amended Complaint but added Count IV, a First Amendment retaliation claim on behalf of Plaintiff Surface.  Plaintiff Surface alleges in Count IV that he was subject to an excessive discipline because of his participation in the instant lawsuit when "Defendant Lock made up and concocted a false and phony story that Plaintiff William Surface 'bitch slapped' an innocent citizen, and thereby committed an assault and

17

battery, and used excessive force against the innocent citizen, which story was absolutely untrue, and Defendants knew it!"  (Third Am. Comp., ¶ 97.)

### III. STANDARD OF REVIEW

The Defendants moved for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure.  This rule provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of genuine issue of material fact."  *Id.* at 323; *see also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).  In making this evaluation, however, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party.  *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment.  *Celotex*, 477 U.S. at 322-23.  The non-moving party may not rest upon the mere

18

allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. FED. R. CIV. P. 56(e).  The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact.  *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

## IV. ANALYSIS

### A.    Reverse Race Discrimination

In Count I, Plaintiffs set forth claims of reverse racial discrimination pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1981.  (Third Am. Compl. at ¶¶ 13-43.)  Plaintiffs claim that Defendants violated their federal Constitutional rights when they failed to promote Plaintiffs to the position of provisional sergeant in December 2011, January 2012, and August 2015.  (Third Am. Compl. ¶¶ 18-16.)

As an initial matter, the Court grants summary judgment as to Plaintiffs' § 1981 discrimination claims because those claims fail as a matter of law.  As recognized by this Court in its earlier opinion and order regarding Defendants' motion to dismiss, "the law is clear in the Sixth Circuit that there is no private cause of action arising from § 1981 against governmental entities or state actors in their official or individual capacities."[5]  *Garceau I*, No. 12-15513, 2013 WL 5954493, at *4 (citing *McCormick v. Miami Univ.*, 693 F.3d 654, 660-61 (6th Cir. 2012)); *Mensah v. Mich. Dep't of Corr.*, 513 F. App'x 537, 538 (6th Cir. 2013) (per curiam) ("The

---

[5] The Court notes that Defendants did not move to dismiss Count I in their previous motion to dismiss.

Supreme Court held in *Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 735 (1989), that Congress intended § 1983 to provide the exclusive remedy for the violation of rights guaranteed by the § 1981 when the alleged violator is the local government.  In *McCormick* [], the Sixth Circuit recently interpreted *Jett* to apply to suits against state actors sued in their individual capacity."); *Carmichael v. City of Cleveland*, 571 F. App'x 426, 431-32 (6th Cir. 2014) (noting that §1981, as amended by the Civil Rights Act of 1991, "does not provide a private cause of action against governmental entities or state actors in their official of individual capacities" and that alone was sufficient to dismiss the §1981 claim.).

As to Plaintiffs' claim pursuant to 42 U.S.C. § 1983, it is well settled that in order to make a § 1983 claim, a plaintiff must establish a violation of an existing constitutional right by a person acting under color of state law.  *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978); *Waters v. City of Morristown*, 242 F.3d 353, 358-59 (6th Cir. 2001).  Here, Plaintiffs allege that they were victims of reverse racism and deprived of their Fourteenth Amendment right to equal protection under the law when Defendants did not provisionally appoint them as sergeants in 2011, 2012 and 2013.  There is also no dispute that the Defendant Officers were all operating under the color of state law.  The Sixth Circuit has explained that:

> "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."  *Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).  Therefore, "in order to establish an equal protection violation against a public employer in a section 1983 action, a plaintiff must show that the employer made an adverse employment decision 'with a discriminatory intent and purpose.'" *Boger v. Wayne Cnty.*, 950 F.2d 316, 324-25 (6th Cir. 1991) (citation omitted).  The plaintiff must establish that the employment decision at issue would not have been made "but for" the plaintiff's race, *Weberg* [*v. Franks*, 229 F.3d 514, at 522 (6th Cir. 2000)], which is to say he must prove that "discriminatory intent more likely than not was the basis of the adverse employment action."  *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988) (citation and internal quotation marks omitted).

*Toth v. City of Toledo*, 480 F. App'x 827, 823 (6th Cir. 2012) (examining § 1983 claim of racial discrimination in the absence of a Title VII claim).

Generally, "[b]ecause both Title VII and § 1983 prohibit discriminatory employment practices by public employers, this court looks to Title VII disparate treatment cases for assistance in analyzing race discrimination in the public employment context under § 1983." *Weberg*, 229 F.3d at 522; *see also Alomari v. Ohio Dept. of Public Safety*, 626 F. App'x 558, 564 (6th Cir. 2015) ("[t]he elements for establishing an Equal Protection claim under § 1983 and the elements for establishing a violation of [a] Title VII disparate treatment claim are the same." (quoting *Deleon v. Kalamazoo Cnty. Rd. Comm'n*, 739 F.3d 914, 917-18 (6th Cir. 2014)). Discrimination claims brought pursuant to Title VII "are traditionally categorized as either single-motive claims, *i.e.*, where an illegitimate reason motivated an employment decision, or mixed-motive claims, *i.e.*, where both legitimate and illegitimate reasons motivated the employer's decision." *White v. Baxter Healthcare Corp*., 533 F.3d 381, 396 (6th Cir. 2008) (citation omitted).

In *White*, the Sixth Circuit analyzed what analytical framework applied at the summary judgment stage of a mixed-motive claim asserted pursuant to 42 U.S.C. § 2000e-3(m) in the aftermath of the Supreme Court's decision in *Desert Palace v. Costa*, 539 U.S. 90, 92 (2003), which held that a plaintiff could prove a Title VII mixed-motive case through either direct *or* circumstantial evidence. After examining the history of the statutes as well as the frameworks applied by sister Circuits, the Sixth Circuit concluded in *White* that the familiar "*McDonnell Douglas/Burdine* burden-shifting framework does *not* apply to the summary judgment analysis of Title VII mixed-motive claims." *White*, 533 F.3d at 400 (emphasis in original). Instead, a

21

plaintiff "asserting a mixed-motive claim need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiffs; and (2) 'race, color, religion, sex, or national origin was *a* motivating factor' for the defendant's adverse employment action." *Id.* (citing 42 U.S.C. § 2000e-(m)) (emphasis added in *White*). "This burden of producing some evidence in support of a mixed-motive claim is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim." *Id.* at 400 (citation omitted).

In this action, Plaintiffs gave notice in their Third Amended Complaint that they were asserting a mixed-motive theory of discrimination rather than a single-motive claim of discrimination. (Third Am. Compl. at ¶ 40.) Unlike *White*, however, Plaintiffs' discrimination claim is one brought pursuant to § 1983 rather than a Title VII. Defendants' motion for summary judgment assumed, with no analysis, that the familiar tripartite burden-shifting test in *McDonnell Douglas* applied to Plaintiffs' reverse race discrimination claim. (ECF No. 53, at *6-7.) Plaintiffs argued, with a similar lack of analysis, that because they properly gave notice that their claim was a mixed-motive claim, the court must apply the mixed-motive framework in *White*. (ECF No. 58, at *11-12.) Defendants did not challenge the application of the mixed-motive framework in their reply but recognized that *White* only addressed a Title VII claim and argued that Plaintiffs' claim fails under the mixed-motive framework as well.

The Sixth Circuit has not addressed the issue of whether the mixed-motive analysis of *White* applies to a § 1983 claim of discrimination asserted in the absence of a Title VII claim. The Sixth Circuit, however, recently applied this mixed-motive framework in an unpublished decision in which the plaintiff alleged discrimination under both Title VII and § 1983. The Sixth

Circuit analyzed the Title VII and § 1983 claims together and recognized that the elements "for establishing an Equal Protection claim under §1983 and the elements for establishing a violation of [a] Title VII disparate treatment claim are the same." *Alomari*, 626 F. App'x at 565.  The Sixth Circuit then held that the mixed-motive analysis was appropriate because Plaintiff "gave sufficient notice of mixed-motive discrimination in his complaint and motion for summary judgment." *Id*.; *see also Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (Gilman, J., sitting by designation) (adopting the Sixth Circuit's mixed-motive framework as set forth in *White*, and also concluding that Title VII and § 1983 claims have the same elements when they are based on the same facts.).

Here, Defendants have not set forth any argument or analysis as to why the mixed-motive framework should not apply in this action.  Thus, the Court finds Defendants have waived the issue.  Further, it would seem inequitable and illogical if the mixed-motive framework, which is recognized as "not onerous," applied to a § 1983 discrimination claim when a Title VII claim was also asserted, but did not apply to a § 1983 discrimination claim when a Title VII claim was absent from the pleadings.  It is more logical, especially in light of the Sixth Circuit's recent application of this framework to a § 1983 discrimination claim, to assume that § 1983 discrimination claims are subject to the same mixed-motive analysis as a Title VII claim based upon the well-settled fact that "the showing a plaintiff must make to recover on a disparate treatment claim under Title VII mirrors that which must be made to recover on an equal protection claim under section 1983." *Gutzwiller*, 860 F.2d at 1325.  Accordingly, in this action where Plaintiffs gave the requisite notice and Defendants failed to make any reasoned argument that the mixed-motive analysis does not apply, the Court will apply the mixed-motive analysis as

set forth in *White* to the Plaintiffs § 1983 discrimination claims.

1.      Mixed-Motive Analysis

In a mixed-motive analysis the "ultimate question is whether [the plaintiff] presented evidence, direct and circumstantial, from which a reasonable jury could logically infer" that race was a "motivating factor[]" in the adverse employment action. *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012). It is undisputed that Plaintiffs adequately triggered this analysis by raising the issue in both their Third Amended Complaint and also their response to the motion for summary judgment. *Id.* (citing *Spees v. James Marine, Inc.*, 617 F.3d 380, 390 (6th Cir. 2010)). Again, under a mixed-motive analysis, a plaintiff may rely upon both direct and circumstantial evidence and need only show that (1) defendant took an adverse employment action against the Plaintiffs, and (2) that race was a motivating factor of that employment action. *White*, 533 F.3d at 400. The Sixth Circuit has recognized that because "'[I]nquires regarding what actually motivated an employer's decision are very fact intensive,' such issues 'will generally be difficult to determine at the summary judgment stage' and thus will typically require sending the case to the jury." *White*, 533 F.3d at 402 (citation omitted).

Plaintiffs' attorney made clear during oral argument that the only adverse employment action at issue in this action is whether race was a motivating factor in denying Plaintiffs provisional appointments to the rank of sergeant. (Hrg. Trans., at 22-23, Pabst stating: "I don't care, I haven't alleged that there's race discrimination because these Plaintiffs weren't made permanent sergeants. I don't care about the test. And neither did Defendants. The test meant nothing . . . I have sued because these police officers, the white police officers, were excluded for provisional appointments to provisional temporary sergeants and race was used as a factor.")

24

To this end, Plaintiffs contend that there is "overwhelming" direct and circumstantial evidence from which a reasonable juror could draw such a conclusion and set forth a bulleted list of evidence.  The Court finds, however, that the bulk of Plaintiffs' proffered evidence consists of impermissible hearsay, blatant speculation, or misrepresented facts from the record as examined below.

    a.      Direct Evidence

Plaintiffs assert that Defendant Lock "openly, hostilely" referred to Plaintiffs with the racial "slur" of "Garceau and the gang" and the use of the term is direct evidence of a racial bias. (ECF No. 58, Pl.'s Resp.)  Yet, no witness testified that Defendant Lock was ever heard uttering the words "Garceau and the gang."  Rather, individuals testified that Defendant Patterson, Rodney Williams (in internal affairs),  and a former city attorney, Tom Kent, referred to some (but not all) Plaintiffs as "Garceau and the gang."  Further, the Court finds that the term "Garceau and the gang" does not necessarily have an overt racial or criminal meaning.  *See* Webster's Third New International Dictionary (1993) (defining "gang" as "a number of individuals making up a group," e.g. Kool & the Gang, <u>or</u> "a company of criminals," e.g. the Purple Gang.)  Moreover, Plaintiff Garceau testified that he did not believe the term "gang" carried a racial connotation.  (Garceau Dep. at 111.)

"Direct evidence is that evidence, which if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).  Here, Defendant Patterson, Rodney Williams, or Tom Kent's use of this term does not require the conclusion that any discrimination occurred, because none of them were decision-makers and the

term does not carry a racial connotation. Accordingly, the Court concludes that "Garceau and the Gang" does not constitute direct evidence of racial bias.

Plaintiffs next claim that Defendant Lock's threat that he would "kick Garceau's ass" is direct evidence that race played a motivating role in the provisional appointments. While Defendant Lock admitted to making this statement and repeating it to the command staff during a meeting, it is unclear how this statement directed at Plaintiff Garceau is evidence of a *racial* bias in the provisional sergeant appointments. The statement was made in November 2012 after the provisional appointments and does not implicate race on its face. Further, Plaintiffs offer no reason to construe it as evidence of racial bias other than the fact that Defendant Lock did not also threaten an African-American officer. The Court finds Plaintiffs' reasoning unpersuasive. This comment, while not professional, does not speak to any racial bias. Similar to "Garceau and the Gang" this comment is not direct evidence of racial bias.

Plaintiffs also argue that Plaintiff Baldwin's transfer from his position in the courts in early 2011 and his replacement by a female African-American officer after Defendant Lock told him that he needed "a black female" in the courts is direct evidence of racial bias in the provisional appointments. (Baldwin Dep., at 14-15.) In *Norbuta v. Loctite Corp.*, 1 F. App'x 305, 316 (6th Cir. 2001), the Sixth Circuit held that a plaintiff's national origin discrimination claim failed under a mixed-motive framework because reliance solely upon a supervisor's statements regarding nationality was "too thin a reed upon which a jury might base a finding" of discrimination. The Sixth Circuit explained that

> While remarks by a decisionmaker reflecting bias against the plaintiff on the basis of a protected category are relevant to pretext, *see Ercegovich* [*v. Goodyear Tire & Rubber Co.*], 154 F.3d [344, 354-55 (6th Cir. 1996)], "isolated and ambiguous comments are too abstract in addition to being irrelevant and prejudicial, to

support a finding of ... discrimination." *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir.1993) (citations and internal quotation marks omitted). Factors affecting a statement's probative value include the nexus between the discriminatory remarks and the challenged action, "the declarant's position in the corporate hierarchy, the purpose and content of the statement, ... the temporal connection between the statement and the challenged employment action," and whether the statement buttresses other evidence of pretext. *See Ercegovich*, 154 F.3d at 357 (quoting *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 133 (3d Cir.1997)).

*Id.*; *see also Paasewe v. Ohio Arts Council*, 74 F. App'x 505 (6th Cir. 2003).

Under the facts of the present case, the Court finds that this single, stray statement from Defendant Lock does not constitute direct evidence of discrimination. While the comment was made by the decision-maker, the comment was remote in time from the provisional appointments at issue, and the comment was not made in the context of promotions but rather made in regards to a completely different employment context of staffing officers at a court, to wit the need to have a female officer to search female inmates. Most significantly, as examined *infra*, Plaintiffs have offered no other evidence to buttress their claim that this comment was relevant to the provisional sergeant appointments or support their claim of racial discrimination.

In summary, Plaintiffs have not set forth any evidence that if believed, would required "the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn*, 176 F.3d at 926. The Court notes that Plaintiffs' counsel conceded this fact during oral argument, when he explained that existence of direct evidence hinged upon the determination of the ultimate issue, stating: "there's direct evidence because there is a preliminary fact that has to be decided, and depending on how the fact finder decided that fact there could be direct evidence. The preliminary fact is did he use race as a factor in making these provisional appointments." (Hrg. Tr., at 35.)

27

      b.      Circumstantial Evidence

As for circumstantial evidence of racial bias, Plaintiffs submit that Defendant Lock "allows African-American police officers to call white Plaintiff police officers the 'N..... Beating Crew ("NBC"),' despite a Department of Justice Investigation that cleared the Plaintiffs from any alleged wrongdoing." (ECF No. 58, Pls.' Resp., at *13.) Plaintiffs, however, fail to connect the "NBC" to Defendants Lock or Patterson through any evidence or testimony. It appears that the investigation by Rodney Williams and/or the DOJ regarding this claim occurred in 2005, at least four years prior to Defendant Lock becoming the chief of police. Plaintiff Hall testified explicitly that he did not know who coined the phrase and offered merely his *belief* that Defendants Lock and Patterson believed the NBC to be "true." (Hall Dep., at 47-51.) Yet, "rumors, conclusory allegations and subjective beliefs [] are wholly insufficient evidence to establish a claim of discrimination as a matter of law." *Mitchell v. Toledo Hosp*., 964 F.2d 577, 584-95 (6th Cir. 1992). Further, Plaintiff Hall clearly lacked any personal knowledge regarding whether or not Defendants Lock or Peterson were aware of the NBC, condoned it, or believed it to be true. Thus, this testimony is inadmissible pursuant to FED. R. EVID. 602 and cannot be used to create a genuine issue of material fact. *Sperle v. Mich. Dept. of Corr*., 297 F.3d 483, 495 (6th Cir. 2002) ("A party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact."); *Thompson v. City of Lansing*, 410 F. App'x 922, 930-31 (6th Cir. 2011) ("A district court may not consider hearsay evidence on a motion for summary judgment." (citing *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999)).

Similarly, Plaintiffs assert that Defendant Lock "still uses the race based 'Rule of 3,' no matter what the Sixth Circuit Court of Appeals said about not doing such things in the case of *Middleton*, *supra*, where it struck down Defendant City's institutional racist policy." (ECF No. 58, Pls.' Resp., at *14.) This statement is supported by nothing in the record beyond the *personal belief* of *one* Plaintiff officer not involved in the promotional process. (Surface Dep., at 61-62, 88-89.) Morever, Plaintiff Surface was unable to explain the "Rule of 3" policy or how it disadvantaged him. (*Id*.) Again, the personal subjective belief of a plaintiff does not constitute sufficient evidence of a racial animus. *Mitchell*, 964 F.2d at 584-95. Plaintiffs have also failed to lay any foundation that Plaintiff Surface could testify to such a fact or even argue that the City of Flint's promotional process was within the scope of Plaintiff Surface's employment.[6] *Thompson*, 410 F. App'x at 930-31 (finding that "statements by employees are outside of the scope of an employee's employment, and therefore not subject to the party-admission rule, when they concern . . . decisions to which they were not a party." (citing *Liadis v. Sears, Roebuck & Co.*, 47 F. App'x 295, 303 (6th Cir. 2002)).

Plaintiffs also rely upon Plaintiff Laframboise's testimony that another officer, Nelson Hadley, stated "If Chief Lock becomes chief of police, his black people will be taken care of," as circumstantial evidence of discrimination. The Court finds this statement is not circumstantial evidence of discrimination because it constitutes impermissible hearsay. Plaintiffs fail to lay any foundation for Plaintiff Laframboise's testimony in this regard, and fail to offer any hint as to what exception to the hearsay rule might apply to this testimony. The Court cannot rely upon

---

[6] Plaintiffs' attorney clarified during the hearing that he was not claiming that the "Rule of 3" was used by Defendants in this action. (Hr. Trans., at 28.)

29

impermissible hearsay and thus will disregard the statement.

Plaintiffs also confusingly state that Defendant Lock "says nothing critical of the Citizens Service Bureau, as he watches Personnel Director Deidre Pitts classify police officers by race." (ECF No. 58, Pls.' Resp., at *14.)  Defendant Lock testified that he had retired at the time of the Citizen Service Bureau action and neither Defendants Patterson nor Lock had any involvement in the Citizens Service Bureau action.  (Lock Dep. (July 2015), at 37-38; Patterson Dep. (July 2015), at 6-7.)  Further, it is undisputed that the individual responsible for the creation of the Citizens Service Bureau was then-Mayor Williamson – not Defendants Lock or Patterson. Plaintiffs' speculations regarding this matter do not constitute evidence of discrimination.

Next, Plaintiffs assert that the "LEIN sting" constitutes evidence of racial discrimination and contend that Defendants Lock and Patterson warned other African-American officers not to park in a certain parking lot, that despite a long-standing rule, officers continued to park in, so that they could "bust the white police officers."  (ECF No. 58, Pls.' Resp., at *10.)  To this end, Plaintiffs rely upon the testimony of Plaintiff Howe, who testified that an African-American officer, Tanya Meeks, told him that she was told by Defendant Patterson not to park there.  (Hall Dep., at 30-31.)  Plaintiffs, however, fail to connect Defendant Lock to the LEIN sting whatsoever.  Plaintiffs rely again upon impermissible hearsay or double hearsay: what a Plaintiff heard from another officer as told by another officer.  The Court concludes that this is not circumstantial evidence of racial discrimination or bias by Defendants Patterson or Lock.

Plaintiffs also contend that Defendants Lock and Patterson made the provisional appointments without regard to seniority and "mislabeled" temporary appointments as provisional assignments.  Plaintiffs claim that in the previous case involving the Citizens Service

30

Bureau, the "provisional appointments" to that bureau were made on the basis of seniority. Plaintiffs then conclude that seniority is selectively used only to favor the advancement of African-American officers.  (ECF No. 58, Pls.' Resp., at *8-9.)  The Court finds that this evidence would not lead a juror to reasonably conclude that race was a motivating factor in the instant provisional appointments.  There is absolutely no basis to compare this action to the Citizens Service Bureau case when there is no evidence that any of the decision-makers in that case were involved in the present case, and Defendant Lock testified that he was retired at that time.  Moreover, there is evidence that an independent Arbitrator rejected Plaintiffs' argument that Article 35 of the CBA applied to provisional appointments, and further held that seniority did not need to be a factor in those appointments.  While the Arbitrator's decision does not have a preclusive effect on this Court's conclusion regarding the discrimination action, it is evidence that supports Defendants' argument that the method for appointing provisional sergeants did not violate the CBA.

Plaintiffs also claim that the lack of seniority-based provisional appointments is circumstantial evidence of racial bias.  This claim is unsupported by the record.  It is undisputed that if Defendants Lock and Patterson appointed provisional sergeants based on seniority alone, as Plaintiffs contend was required by the CBA, none of the Plaintiffs would have been appointed a provisional sergeant.  Additionally, based upon the seniority chart, provisional appointments based solely upon seniority would have resulted in the appointment of more African-American officers than were provisionally appointed by Defendants Lock, Patterson and Captain Johnson:

| 1. Eugene Brown (AA) | 6. Jeffrey Washington (AA) | 11. David Bender (C) (pro) |
| 2. Randolph Tolbert (AA) | 7. Karl Petrich (AA) (pro) | 12. Mark Peck (C) |

| 3. Arthur Coffee (AA) | 8. William Turner (AA) | 13. Alphonso Williams (AA) |
|---|---|---|
| 4. Michelle Tucker (AA) | 9. Terry Neeley (AA) | 14. Daniel Mata (H) (pro) |
| 5. Jerome Adams (AA) | 10. Andrew Gauthier (C) (pro) | 15. Eric Rogers (AA) (pro) |

(Ex. O, Seniority Spreadsheet; Ex. M, Ethnicity Breakdown; compare to Defendants' provisional appointments of nine African-American officers, five Caucasian officers, and one Hispanic officer.)  Further, Plaintiffs' argument that the correct comparable is between Plaintiffs' seniority and the seniority of the officers Defendants' choose to provisionally appoint is unpersuasive. Plaintiffs have repeatedly argued that pursuant to Article 35 of the CBA, seniority alone should have dictated the provisional appointments.  Thus, the proper comparison based on seniority would be among *all* the eligible officers and Plaintiffs and not merely between Plaintiffs and the officers provisionally appointed.

Plaintiffs similarly argue that Defendants Lock and Patterson's use of subjective criteria evidences a racial bias.  As examined above, however, utilizing Plaintiffs' proffered objective standard of seniority would have resulted in the appointment of more African-American officers and none of the Plaintiffs.  Additionally, an Arbitrator found that Article 35 did not apply to provisional appointments and that such appointments did not need to be based on seniority. Moreover, "[s]ubjective employment evaluations, however, are not illegal per se.  The ultimate issue in each case is whether the subjective criteria were used to disguise discriminatory action." *Grano v. Dept. of Development of City of Columbus*, 699 F.2d 836, 838 (6th Cir. 1983).  In the present case, Defendants' use of subjective standards resulted in more Caucasian provisional appointments than would have occurred using the objective standard of seniority and this fact undermines any argument that Defendants' use of subjective standards hid a discriminatory

motive.

Plaintiffs also contend that Officer Booth's appointment to provisional sergeant is circumstantial evidence of racial bias because he was previously on medical leave for a year and half and he did not supervise anyone in his position as a member of an ATF task force. Plaintiffs, however, misstate the record and rely solely upon the testimony of a Plaintiff Hall with no explanation of his personal knowledge of Officer Booth's record.  (Hall Dep., at 36-37.) Officer Booth testified that he was laid off in 2009 for 18 months and that he was later provisionally appointed while he was on assignment with the ATF.  (Ex. 22, Booth Dep., at 9.)

Plaintiffs also assert that the provisional appointments could not go past 90 days, yet "the African-American Defendants allowed the African-American provisional sergeants to remain in position past 90 days" and the breaking of that rule evidences an improper motive.  (ECF No. 58, Pls.' Resp., at *14.)  Plaintiffs fail to note that *all* the provisional sergeants were continued past 90 days regardless of their race.  Further, the Rule VII Section 3 itself noted that the 90-day limit to the appointment was only "insofaras [sic] practicable."  (*See* Young Dep., Ex. 1, at 3, PGID 1185.)  It is also undisputed that the provisional appointees continued in their positions past 90 days because there was no promotional exam in place, or alternatively, not enough officers passed the exam to fill all the positions.

Next, Plaintiffs contend that Defendant Lock told Plaintiff Howe "not to take the test, because he won't promote him even if he passes the test!"  (ECF No. 58, Pls.' Resp., at *14.) Plaintiffs also contend that Defendant Lock advised Officer Lott, who was provisionally appointed in 2011 and again in August 2012 after failing the first test, that she did not need to worry about failing the first promotional exam because he would keep her on as sergeant.  (*Id.*)

Plaintiffs rely upon hearsay testimony for this evidence and misrepresent the record.  Plaintiff

Howe never testified that Defendant Lock made such a statement to him directly, but rather,

Plaintiff Howe heard the statement second hand.  (Howe Dep., at 26-27, 40.)  Again, Plaintiffs

have wholly failed to provide any foundation for Plaintiff Howe's knowledge or any reason why

the foregoing testimony is not hearsay.  "[T]he party arguing for admission bears the burden of

establishing the proper foundation for the admissibility of the statements."  *Liadis v. Sears,*

*Roebuck, and Co.*, 47 F. App'x 295, 303 (citing *Mitroff v. Xomox Corp.*, 797 F.2d 271, 275 (6th

Cir. 1986)).  Finally, Plaintiff Howe testified that his reason for not taking the promotional exam

in 2012 was his belief that he would never have been promoted regardless of his score based on

statements made by Lieutenant Peterson (who was not deposed in this matter).  (*See* Howe Dep.,

at 26-27.)  As examined *supra*, the Court cannot rely upon inadmissible evidence and

speculation, and Plaintiffs have failed to offer any foundation for this evidence or basis for an

exception to the hearsay rules.

In conclusion, despite the immense record in this action, Plaintiffs have produced only a

single stray comment made by Defendant Lock in regards to a different position a year prior to

when he began provisionally appointing sergeants.  Almost the entirety of Plaintiffs' evidence of

racial bias was speculation, inadmissible hearsay and misstatements of the record.  While the

standard under a mixed-motive theory claim is not "onerous," Plaintiffs must still produce

enough evidence "from which a reasonable jury could logically infer that" race was a motivating

factor in Defendants' decision not to provisionally promote Plaintiffs.  *Ondricko*, 689 F.3d at

649.  Even taking the facts in a light most favorable to Plaintiff, the Court finds that Defendant

Lock's single, stray comment that was temporally remote to the instant promotions is insufficient

34

to meet this lenient standard.  Significantly, the Court finds the stray comment even less probative in light of the uncontroverted fact that fewer African-American officers were provisionally appointed by Defendants Lock and Patterson than would have been promoted if Defendants had made the provisional appointments based on seniority alone.  Accordingly, the Court will GRANT Defendants' Motion for Summary Judgment regarding Reverse Race Discrimination.

B.      First Amendment Retaliation Claims

In Counts III and IV of the Third Amended Complaint, five of the fourteen Plaintiffs, Garceau, Howe, Dickenson, Wooster, and Surface allege they were retaliated against by Defendants when they opposed racial discrimination, thereby violating their First Amendment rights.  As set forth, *supra*, this Court dismissed Plaintiffs' claims of retaliation based upon the filing of the class action grievance and based upon complaints regarding Defendant Patterson's use of the LEIN technology.  *Garceau I*, No. 12-15513, 2013 WL 5954493, at *6-8.  Therefore, the only remaining claims of First Amendment retaliation relate to the filing of this lawsuit.[7]

To establish a First Amendment retaliation claim pursuant 42 U.S.C. § 1983, a plaintiff must prove the following: (1) the plaintiff engaged in protected speech or conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two – in other words, "that the adverse action was motivated at least in part by the plaintiff's

---

[7] This includes Count IV of the Third Amended Complaint regarding Plaintiff Surface's allegation of excessive discipline related to, *inter alia*, his involvement in this lawsuit.  (3d Am. Compl., at ¶ 92(iv)).  Neither party advanced any other argument or referenced any other possible basis for Defendant Surface's First Amendment claim and the Court considers any other possible basis waived.

protected conduct." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (*en banc*); *Sowards v. Loudon Cnty., Tenn.*, 203 F.3d 426, 432 (6th Cir. 2000). "A 'motivating factor' is essentially [a] but-for cause..." *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007). The Court notes that "[b]ecause direct evidence of motive is difficult to produce, 'claims involving proof of a defendant's intent seldom lend themselves to summary disposition' and 'circumstantial evidence may provide sufficient evidence of retaliatory intent to survive summary judgment.'" *Kennedy v. City of Villa Hills, Ky.*, 635 F.3d 210, 218 (6th Cir. 2011) (citation omitted).

Once the plaintiff "raises an inference that the defendant's conduct was motivated in part by plaintiff's protected activity, the burden shifts" to the defendant to show by a preponderance of the evidence that he "would have taken the same action in the absence of the protected activity." *Id*. at 218-19 (citing *Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 821 (6th Cir. 2007)); *Eckerman v. Tenn. Dept. of Safety*, 636 F.3d 202, 208 (6th Cir. 2010) (citing *Sowards v. Loudon Cnty*, 203 F.3d 426, 431 (6th Cir. 2000)). "Once this shift occurs, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Eckerman*, 636 F.3d at 208 (citation omitted). "Unlike in the *McDonnell Douglas* burden-shifting framework, the burden does not shift back to a plaintiff to show pretext in First Amendment retaliation claims." *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012).

1.    New Claims of Retaliation

In their response brief, Plaintiffs attempt to assert a new claim of retaliation on behalf of Plaintiffs Garceau, Dickenson, Howe, Wooster, and Surface based upon the fact that "all the

black candidates who failed the test were promoted and/or re-promoted to the 'provisional' sergeant position while Plaintiffs were not."  (ECF No. 59, Pls.' Resp., at *13.)  Plaintiffs claim that this "retaliatory action" occurred "just three and six months after this lawsuit was filed!" (*Id.*)

The Court declines to address this new claim.  The Sixth Circuit has explained that a "court's evaluation of the scope of [a plaintiff's] claims amounts to a decision of the sufficiency of a pleading" and a notice inquiry "necessarily proceeds on a case by case basis."  *Carter v. Ford Motor Co.*, 561 F.3d 562, 566, 568 (6th Cir. 2009).  The key issue in evaluating a challenge to the sufficiency of a pleading is the issue of notice.  *Id.* at 566.  Significantly, the Sixth Circuit has held that "a non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion." *Tucker v. Union of Needletrades, Industrial & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005); *see also Kuns v. Ford Motor Co.*, 543 F. App'x 572, 577 (6th Cir. 2013) (declining to reach the plaintiff's argument that was first asserted in a response to a summary judgment motion and not included in a subsequent amended complaint).

In the present case, Plaintiffs contend that their new claim of retaliation was "revealed" through discovery, however, they failed to move to amend their Complaint to add this claim during or at the close of discovery.  Plaintiffs offer no reason for their failure to amend. Plaintiffs' failure to amend the complaint is especially egregious in light of the fact that Plaintiffs were allowed to amend their complaint a third time to add an additional claim of retaliation as recently as August 2015.  (ECF No. 47.)  Further, there is nothing in the record or the pleadings that give this Court any reason to believe Defendants were on notice regarding this claim.  For

these reasons, the Court declines to reach this new claim of retaliation.

Plaintiffs Wooster and Howe's claims of retaliation in the Third Amended Complaint related only to those allegations that were dismissed by this Court previously.  Additionally, as discussed above, the Court declines to reach Plaintiffs' new and unpleaded retaliation claim. Accordingly, Plaintiffs Wooster and Howe's claims of  First Amendment retaliation have been dismissed.

The Court also declines to address Plaintiff Garceau's termination and later reinstatement to the Flint Police Department.  Both parties make reference to these facts in their briefing but these facts are not set forth in the Third Amended Complaint and fall well outside the relevant time period at issue in this action.

2.      Plaintiffs Garceau and Dickenson

Plaintiffs Garceau and Dickenson forth claims of First Amendment retaliation based upon the alleged excessive disciplines they received after this civil rights action was filed.  To this end, Defendants move for summary judgment and argue that Plaintiffs Garceau and Dickenson's claims of First Amendment retaliation fail because despite having temporal proximity to the filing of this lawsuit, Plaintiffs cannot evidence the required causal connection that "the adverse action was motivated at least in part by the plaintiff's protected conduct."  *Scarbrough*, 470 F.3d at 255.  Defendants also assert that Plaintiffs Garceau and Dickenson's First Amendment retaliation claims fail because they can evidence that they would have received the same treatment in the absence of this lawsuit.

a.      Causal Connection

"A plaintiff successfully demonstrates a causal connection between the adverse action

and the protected conduct by offering direct or circumstantial evidence indicating that the protected conduct was a substantial or motivating factor behind the adverse action against plaintiff." *Eckerman v. Tenn. Dept. of Safety*, 636 F.3d 202, 208 (6th Cir. 2010) (citing *Kreuzer v. Brown*, 128 F.3d 359, 363 (6th Cir. 1997)); *see also Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977). The Sixth Circuit has held that a "'motivating factor' . . . is one without which the action being challenged simply would not have been taken." *Holzemer v. City of Memphis*, 621 F.3d 512, 525 (6th Cir. 2010) (citation omitted). To evidence this causal connection a plaintiff must "produce enough evidence of a retaliatory motive such that a reasonable juror could conclude that the [adverse action] would not have occurred but for his engagement in protected activity." *Eckerman*, 636 F.3d at 209.

"'In analyzing the facts in temporal proximity cases, we have always looked at the totality of the circumstances to determine whether an inference of retaliatory motive would be drawn.'" *Holzemer*, 621 F.3d at 526 (quoting *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010)). The Sixth Circuit has summarized the law on this issue "as recognizing the possibility that, on a particular set of facts, extremely close temporal proximity could permit an inference of retaliatory motive, but also recognizing that often evidence in addition to temporal proximity is required to permit the inference." *Vereecke*, 609 F.3d at 401 (citation omitted).

The present lawsuit was filed on December 17, 2012. (ECF No. 1.) Shortly thereafter, on January 11, 2013, Plaintiff Garceau received a three-day suspension for unsatisfactory performance related to his failure to find or investigate a VIN number on an abandoned car. On January 15, 2013, Plaintiff Dickenson received an eight-day suspension related to his alleged

failure to get out of the car to respond to a call.  The Court notes that both of these underlying incidents occurred well before the filing of this lawsuit.  Accordingly, the incidents themselves were not contrived by Defendants in retaliation for the filing of this lawsuit.

Plaintiff Garceau also claims that Defendant Patterson demeaningly referred to him and at least two other plaintiffs in this litigation as, "Garceau and the gang" shortly after the lawsuit was filed.  This comment, which the Court has previously concluded does not necessarily denote a nefarious depiction, does not lend support to Plaintiff Garceau's retaliation claims.  Plaintiff Dickenson has wholly failed to show any other circumstances or evidence that would support a retaliatory motive outside of the temporal proximity of the date of his discipline and the filing of this lawsuit.

Plaintiffs Garceau and Dickenson also argue that evidence regarding the "NBC" and Defendant Lock's statement that he would "kick Garceau's ass" support their claims that the filing of this lawsuit substantially motivated Defendants' decision to suspend them in January 2013.  (ECF No. 59, Pls.' Resp., at *14.)  The Court, however, finds this evidence as irrelevant to Plaintiffs' claims of retaliation because the NBC investigation occurred some ten years prior to this action and Plaintiffs fail to establish any other connection between Defendants Lock and Patterson and the NBC, outside of impermissible speculation.  Further, Defendant Lock's statement regarding Plaintiff Garceau also predated the filing of this lawsuit and thus cannot be relevant to establishing a retaliatory motive based upon an event that had not yet occurred.  Further, the Court notes Plaintiffs offered no case law or analysis to buttress their arguments on this issue.

40

Given these facts, the Court concludes that Plaintiffs have failed to show that temporal proximity alone can carry the day in this action.  In *Vereecke*, the Sixth Circuit recognized that it only "rarely" found "a retaliatory motive based only on temporal proximity" and held that timing that was "little more than coincidence" was insufficient to show causation.  *Vereecke*, 609 F.3d at 400-01 (collecting authority).  Similarly, here, Plaintiffs Dickenson and Garceau have not pointed to any other relevant or admissible evidence to relate their suspensions with the filing of this lawsuit.

b.      Actions Otherwise Taken in Absence of Protected Conduct

Regardless of whether Plaintiffs Garceau and Dickenson can establish a prima facie case of First Amendment retaliation, the Court also concludes that summary judgment on their claims must be granted because Defendants have shown that the employment decision would have been the same absent the protected conduct, and that even viewing the facts in a light most favorable to plaintiff "no reasonable juror could fail to return a verdict for the defendant."  *Eckerman*, 636 F.3d at 208 (citation omitted).

The Defendant City of Flint practices a progressive discipline policy where officers are subjected to increasingly severe consequences for infractions; beginning with a verbal counseling or oral reprimand, then progressing to written reprimand, suspension, and eventual termination.  (Patterson Dep. (Nov. 2015), at 19.)  Prior to Plaintiff Dickenson's eight-day suspension in January 2013, he was subject to approximately fifteen disciplines over his career. (ECF No. 62, Ex. H, Dickenson Discipline History.)  Significantly, Plaintiff Dickenson received a ten-day suspension for unsatisfactory performance on October 20, 2011; a fifteen-day suspension for unsatisfactory performance on January 25, 2012, and a five-day suspension on

41

October 15, 2012.  (*Id*.)  Given the progressive discipline policy and Plaintiff Dickenson's

discipline history, which included *longer* suspensions in the year immediately prior to the

alleged excessive discipline at issue, Defendants have provided sufficient evidence to show

Plaintiff Dickenson would have received the same discipline regardless of the institution of this

lawsuit.  Further, Plaintiffs failed to offer any evidence or analysis regarding this issue and have

failed to show by any comparison that Plaintiff Dickenson's discipline was actually "excessive"

as compared to any other officer who received discipline for a similar offense.  Accordingly,

Defendants have evidenced that Plaintiff Dickenson would have received the same discipline

regardless of this lawsuit being filed and, therefore the Court concludes that summary judgment

is required upon this basis as well.

Similarly, Plaintiff Garceau's three-day suspension is supported and in-line with the

progressive discipline policy of the Defendant City.  Plaintiff Garceau's discipline history

reveals that his January 10, 2013 suspension was the sixth discipline of his career, but his third in

less than four months.  (ECF No. 62, Defs.' Reply, Ex. G, Garceau Discipline History.)

Previously on May 18, 2012, Plaintiff Garceau had received an oral reprimand for unsatisfactory

performance and on August 28, 2012, Plaintiff Garceau received an oral reprimand and

counseling for another instance of unsatisfactory performance.  (*Id*.)

Significantly, Plaintiff Garceau did not offer any argument or analysis to show that the

three-day suspension was "excessive" in light of the progressive discipline policy or as

compared to any other officer with a similar discipline history.  *See Gaspers v Ohio Dept. of

Youth Servs*., 648 F.3d 400, 416 (6th Cir. 2011) (finding a plaintiff had provided sufficient

evidence of a causal connection between the protected conduct and adverse employment action

by comparison of "other superintendents" who received short term suspensions for bad conduct as compared to plaintiff who had committed "one mistake" and was removed from the position). The Court notes that Plaintiff Garceau attached an affidavit to his response in which he attested that "there is a disporportionality [sic] of disciplines and harsher punishments when it comes to white police officers versus black police officers."[8]  (ECF No. 59, Ex. 5, Garceau Aff., at ¶ 8.) Plaintiff Garceau also attested that an African-American officer Arnold Patrick was charged with domestic violence and "conduct unbecoming an officer" but received no discipline as compared to Plaintiff Garceau who received "a five day suspension and a 6 day suspension for alleged 'unsatisfactory work performance.'"  (*Id*. at ¶ 6.)  Plaintiff Garceau's affidavit, however, is not relevant to his retaliation claim because it addresses suspensions that are not at issue in this action.  Additionally, the affidavit does not speak to any retaliatory motive in regards to the filing of this lawsuit but speaks only to Plaintiff Garceau's extremely general conclusions that he was historically treated more harshly than African-American officers.

In sum, Defendants have sufficiently evidenced that Plaintiff Garceau would have received a three-day suspension regardless of this lawsuit being filed and the Court finds that no reasonable juror would find for Plaintiff Garceau on this issue.  Accordingly, the Court will grant Defendants' motion for summary judgment as to this claim.

3.      Plaintiff Surface

Plaintiff Surface received a 29-day suspension in October 2013 for his alleged use of excessive force during an arrest in August 2013.  Plaintiff Surface claims that he received this

---

[8] Plaintiff Garceau did not cite this affidavit in support of any relevant argument in his briefing and he similarly failed to articulate an argument regarding the comparison of Plaintiff Garceau's discipline in January 2013 to any other particular officer's discipline.

allegedly excessive suspension in retaliation for filing this lawsuit in December 2012.

Defendants argue that this claim fails because it lacks temporal proximity from the filing of this

lawsuit and because Plaintiff Surface would have received the 29-day suspension regardless of

the protected conduct in this action.

In evaluating temporal proximity in retaliation cases, the Sixth Circuit has recognized

that a court must look at the totality of the circumstances and that "the more time that elapses

between the protected activity and the adverse employment action, the more the plaintiff must

supplement his claim with 'other evidence of retaliatory conduct to establish causality.'"

*Vereecke*, 609 F.3d at 400-01 (6th Cir. 2010) (citation omitted).

In the present case, while Plaintiff Surface's suspension was not meted out until almost

10 months after the filing of this lawsuit, there is other evidence in the record that could establish

a retaliatory motive connecting the suspension to the filing of this lawsuit.  Plaintiff Surface's

29-day suspension did not reflect the progressive discipline policy of the City of Flint.  Plaintiff

Surface's discipline history evidences three oral reprimands and two written reprimands over the

last 17 years, and none of them involved excessive force.  (ECF No. 62, Ex. F, Surface

Discipline History.)  Plaintiff Surface's most recent discipline was a written reprimand in

October 2012.  (*Id.*)  Significantly, Plaintiff Surface had never received a suspension prior to

October 2013.  Given these facts, a 29-day long suspension is an extremely severe sanction that

is clearly out of step with Plaintiff Surface's previous disciplines.

Defendants concede that Plaintiff Surface's suspension was not a "progressive"

discipline, but contend that Defendant Lock was justified in not following the progressive

discipline policy in this instance because of the seriousness of Plaintiff Surface's actions.

44

Defendants' argument, however, is belied by the independent arbitrator's decision overturning the 29-day suspension. (ECF No. 59, Ex. 25, 2015 Surface Arbitration Decision.)  In the arbitration opinion, the arbitrator found that the evidence established that Plaintiff Surface struck the suspect on the back of the head but "that it was not much of a strike, the suspect's head was not displaced, there was no complaint filed by the suspect, and contrary to a finding by Internal Affairs, the blow was to the back of the head." (*Id*.)  The arbitrator went on to conclude that "I am convinced that a 29 12-hour day unpaid suspension was an excessive response" (*id*., at 14) and that "the evidence does not establish that [Plaintiff Surface's] misconduct, if indeed it is assumed that discipline was appropriate, was so egregious to exceed the second offense and the initial penalty for a third offense of the use of non-deadly excessive force" (*id*., at 16).  The arbitrator overturned the suspension and ordered Plaintiff Surface be made whole.  While the arbitration decision is not binding on this Court regarding the present First Amendment claim, the arbitration decision is evidence that, in this instance, clearly raises a genuine issue of material fact regarding whether Plaintiff Surface's discipline was appropriate given the infraction.

Also supporting an inference of retaliation is the fact that beyond his suspension, Plaintiff Surface was also put on administrative leave with no explanation after the incident, then light duty for a month, and then back to full duty shortly before being formally suspended for 29 days. (Plaintiff Surface Dep. (July 2015), at 47-48.)  Moreover, Defendant Patterson testified that he could not remember any officer receiving a 29-day suspension for use of excessive force over his 28-year-long career.  (Patterson Dep. (Nov. 2015), at 23.)  Plaintiff Surface also received his 29-day discipline the same day Defendant Lock retired, and was called back to duty by the new chief of police before his full 29-day suspension was completed.  (Plaintiff Surface Dep.

45

(October 2015), at 55-58.)

Viewing these facts in a light most favorable to Plaintiff Surface, the Court finds that he has set forth sufficient evidence to show that his suspension was substantially motivated by the filing of this lawsuit and that there remains genuine questions of material fact regarding whether he would have received the 29-day suspension in the absence of that protected conduct. Thus, the Court will deny Defendants' motion for summary judgment as to Plaintiff Surface's First Amendment claim against Defendant Lock and the Defendant City.

## V. CONCLUSION

For all these reasons, the Court GRANTS Defendants' Motion for Summary Judgment regarding Reverse Race Discrimination (ECF No. 53) and GRANTS IN PART Defendants' Motion for Summary Judgment regarding First Amendment Retaliation (ECF No. 54) such that only Plaintiff Surface's claim of First Amendment retaliation survives against Defendants Lock and City of Flint.

IT IS SO ORDERED.


s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: August 31, 2016

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 31, 2016.


s/Deborah Tofil
Case Manager

46